**R.B., Appellant (CX–95–365), Respondent (CX–95–527),**

v.

**C.S., Norman County Social Services Board, Respondents,**

**Elroy Hanson, as Guardian Ad Litem of C.M.A., a minor, Respondent (CX–95–365), Appellant (CX–95–527).**

**Nos. CX–95–365, CX–95–527.**

Court of Appeals of Minnesota.

Aug. 29, 1995.

Galen J. Vaa, Moorhead, for R.B.

William Steven Kirschner, Fargo, ND, for C.S.

Thomas Opheim, Norman County Atty., Susan Rantala Nelson, Asst. County Atty., Ada, for Norman County Social Services Bd.

Elroy E. Hanson, Mahnomen, pro se.

Considered and decided by TOUSSAINT, C.J., and KALITOWSKI and HOLTAN *, JJ.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

HARVEY A. HOLTAN, Judge.

Appellant R.B. (putative father) challenges the trial court's determination that he lacks standing to bring a paternity action. Appellant C.M.A. challenges the trial court's denial of her request for blood tests under Minn. Stat. §§ 257.55, 257.57, on grounds that it is in her best interests to know who her biological father is. We affirm in part, reverse in part, and remand.

## FACTS

C.M.A. was born out of wedlock on October 6, 1993 in Fargo, North Dakota. Around the time of conception, respondent C.S. had sexual relations with C.M.A.'s mother. The putative father claims to have had relations with the child's mother around the same time. Both men knew the mother became pregnant.

C.S. held C.M.A. out as his own child, provided for her support, paid or submitted to insurance her medical bills, and exercised his visitation rights. The putative father did not visit C.M.A. at birth or when she had surgery. He did not know what her surgery was for or her birth date. The putative father visited the mother when she was at home and brought a stuffed animal, but it is unclear if it was for the 19–year–old mother or C.M.A. The putative father did not offer to pay hospital bills or provide child support. Furthermore, he did not object when the mother told him that C.S. was being named C.M.A.'s father.

C.S. signed a declaration of paternity on December 20, 1993, that was immediately submitted to the North Dakota registrar for vital statistics. C.S. and the mother also signed a stipulation concerning paternity, child support, custody and visitation that was approved by the court on January 3, 1994, and entered as an adjudication of paternity. Pursuant to stipulation, the trial court awarded physical custody of C.M.A. to her mother and joint legal custody to both parties subject to C.S.'s liberal rights of visitation. It appears from the limited record available to this court that C.M.A. was not made a party to the adjudication of paternity and was not represented in those proceedings.

C.M.A.'s mother was killed in a car accident on February 9, 1994, one month after C.S. was adjudicated C.M.A.'s father. C.S. took custody of C.M.A. and moved the court for sole custody. The trial court granted temporary custody and ordered that a guardian ad litem be appointed to make custody and visitation recommendations.[1] The guardian ad litem began investigating C.M.A.'s paternity and rumors surfaced that the child might be the beneficiary of an insurance settlement.

Shortly thereafter, in April 1994, the putative father brought this paternity action seeking blood tests to determine C.M.A.'s paternity. The guardian ad litem counterclaimed and cross-claimed, requesting blood tests under Minn.Stat. §§ 257.55, 257.57 on grounds it would be in C.M.A.'s best interest to know who is her biological father. The guardian ad litem recommended that C.M.A. live with her biological father but raised no concerns with respondent's fitness as a parent.

The role and authority of the guardian ad litem is unclear. The guardian was appointed for the sole purpose of investigating issues of child custody and visitation. The guardian has, in the present action, asserted a claim to establish paternity. We are also concerned because the guardian has a prior attorney-client relationship with appellant. The trial court should determine if the guardian is acting with authority and in the best interests of the child.

The trial court dismissed the action on summary judgment on grounds that the putative father lacked standing to bring a paternity action because C.M.A. has an adjudicated father. The trial court also rejected

---

1. The appointment of the guardian ad litem at this point to make custody recommendations is troubling as a possible infringement of C.S.'s equal protection rights because it raises a question of parental fitness where none has been raised. U.S. Const. amend. XIV; Minn. Const. art. 1, § 7. Respondent, although a single father, is C.M.A.'s legal parent and must be presumed fit to the same extent other classes of parents would be under the circumstances. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

C.M.A.'s request for blood tests on grounds that she failed to state a claim upon which relief could be granted. The putative father and C.M.A. appeal from the summary judgment.

## ANALYSIS

Interpretation of the Minnesota Parentage Act, Minn.Stat. §§ 257.51–.74 (1994), is a matter of law that this court reviews de novo. *In re C.M.G.,* 516 N.W.2d 555, 558 (Minn. App.1994).

### 1. *Putative Father's Standing*

■ In Minnesota, a putative father must be a presumed father in order to bring a paternity action under the parentage act. Minn.Stat. § 257.55, subd. 1. In this case, the putative father is not a presumed father because he has not taken the child into his home, has not held the child out as his own, has no blood tests establishing his paternity, and meets none of the other presumed father categories. *Id.*

■ Furthermore, C.M.A. has an adjudicated father who is her father in the eyes of the law, Minn.Stat. §§ 257.52, 257.54, and that adjudication of paternity is determinative. Minn.Stat. § 257.66, subd. 1.

■ Finally, even if the putative father were to present the court with blood tests establishing his paternity, those tests are given no greater weight than the other presumptions listed in Minn.Stat. § 257.55. Rather, when two men alleging paternity are presumed to be fathers under the statute, the trial court is required to resolve the conflict with the "weightier considerations of policy and logic." Minn.Stat. § 257.55, subd. 2. Thus, in *C.M.G.,* this court held that blood tests were not determinative where there were competing presumptions. 516 N.W.2d at 559–60. There, the man who held the child out as his own, bonded with and supported the child, was declared to be the father notwithstanding blood tests which established another man's paternity. *Id.* at 561.

■ Appellant argues in vague terms that the Minnesota Parentage Act is unconstitutional because it violates his due process and equal protection rights. But appellant's arguments are fundamentally flawed. The due process clause provides that the state may not deprive a person of life, liberty or property without due process of law. *Lehr v. Robertson,* 463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983). Where a party asserts parental rights, the paramount interest is in the child's welfare and "the rights of the parents are a counterpart of the responsibilities they have assumed." *Id.* at 257, 103 S.Ct. at 2991. With the child's interests in mind, a father's due process rights do not arise out of a mere biological link, *id.* at 260, 103 S.Ct. at 2992, but require the existence of an established relationship with the child. *Id.* at 260, 103 S.Ct. at 2993 (citing *Caban v. Mohammed,* 441 U.S. 380, 414, 99 S.Ct. 1760, 1779, 60 L.Ed.2d 297 (1979) (Stevens, J., dissenting)). Absent an effort by the putative father to act as a father, "the mere existence of a biological link does not merit equivalent constitutional protection." *Id.* at 261, 103 S.Ct. at 2993. Only where a father "grasps" the "opportunity" to accept responsibility for a child's future through the parent-child relationship does the Constitution require the state "to listen to his opinion of where the child's best interests lie." *Id.* at 262, 103 S.Ct. at 2993–94.

■ Here, the putative father's parental claim to C.M.A. is based on alleged biology alone. He failed to accept any responsibility for C.M.A., expressed no interest in establishing a relationship with her, and did not object to C.S. being named the child's father. It was not until after C.M.A. was rumored to be the recipient of an insurance settlement that the putative father expressed an interest in being named her father. His interest in C.M.A. does not rise to the level of requiring Constitutional protection.

■ Similarly, the putative father's equal protection argument fails. Equal protection prevents the government from making distinctions between people in the application of the law without a legitimate government interest. *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). Where a father has not carried any responsibility for the child's "daily supervision, edu-

cation, protection, or care," state statutes which do not require his consent before appointing another man the child's father do not violate the Fourteenth Amendment. *Quilloin v. Walcott,* 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978). Where a "parent has either abandoned or never established a relationship, the Equal Protection Clause does not prevent a state from according the two parents different legal rights." *Lehr,* 463 U.S. at 267–68, 103 S.Ct. at 2997 (footnotes omitted).

The putative father lacks standing to bring a paternity action because he is not a presumptive father. Nor does his interest in C.M.A. rise to the level of constitutional protection because even if he were the biological parent, he has failed to "grasp the opportunity" to establish a parent-child relationship with her.

### 2. *C.M.A.'s Standing*

■ Minn.Stat. § 257.66 provides that an adjudication of paternity is determinative of the parent-child relationship "for all purposes." But strict application of the Minnesota Parentage Act would result in C.M.A. being bound by a paternity action to which she had no notice nor opportunity to be heard. Because this would be an unconstitutional deprivation of due process, and we must presume that the statute is constitutional, *In re Haggerty,* 448 N.W.2d 363, 364 (Minn.1989), we hold that a child who is not represented in an adjudication of her paternity may bring a subsequent paternity action pursuant to the Minnesota Parentage Act

and the results of the earlier adjudication are not determinative as to her.

In *Johnson v. Hunter,* 447 N.W.2d 871 (Minn.1989), the child was allowed to commence a separate paternity action where she had been unrepresented in an earlier adjudication. The supreme court held that it is more important to protect a child's interests in paternity actions through representation than to be concerned with the procedural difficulties presented with two inconsistent judgments. *Id.* at 876.

■ Like the Minnesota Supreme Court, we realize that this could result in inconsistent judgments of paternity. In *Hunter,* the Minnesota Supreme Court suggested that the legislature "consider amending the Parentage Act's permissive language regarding joinder of children" due to concern over the protection of children's interests through representation. *Id.* at 875. The *Hunter* court also noted that the Uniform Parentage Act, from which the Minnesota Parentage Act, Minn.Stat. §§ 257.51–.74, was modeled, requires a child to be made a party to all paternity actions. *Id.* at 874. But, for unknown reasons, the Minnesota legislature made joinder of a child mandatory only in a few instances, none of which apply to this case, such as where a putative father seeks to establish his paternity.[2]

In the six years since *Hunter,* the legislature has not acted to eliminate the possibility of inconsistent judgments where a child is unrepresented in paternity adjudications.[3] As a result, C.M.A.'s interests being paramount, she is entitled to be a party to an

---

**2.** This also raises concerns because it implies that a child must be protected when a putative father brings a paternity action to establish a relationship with his child but not when the mother seeks adjudication of paternity. As the statute recognizes and the Minnesota Supreme Court points out, a child's interests in a determination of paternity is distinct and separate from those of both her mother and her father. Minn. Stat. § 257.60; *Hunter,* 447 N.W.2d at 874. We question what legitimate state interest requires protection of a child's interests when her alleged father brings the action to declare himself a parent but not when the mother seeks to have his paternity adjudicated.

**3.** The possibility of inconsistent judgments may be resolved with a Minn.R.Civ.P. 60.02(c) or (f)

motion, depending on how the facts are presented, filed simultaneously with a motion to join the original paternity action with the child's paternity action. The court in its paternity decision could vacate the first judgment if it deems that the second judgment of paternity would be inconsistent. If the results are not inconsistent, the court need only affirm the first adjudication and deny the Rule 60.02 motion. We note that after the parties filed their briefs but before oral argument, the legislature amended Minn.Stat. § 257.57, subd. 2, regarding the time limit to bring an action for declaring the nonexistence of certain father-child relationships. *See* 1995 Minn.Laws ch. 216, §§ 2, 7. The parties did not address that amendment at oral argument and we decline to do so as well.

adjudication of her paternity, notwithstanding the prior paternity action.

## DECISION

The trial court's decision to deny standing to appellant putative father is affirmed. The dismissal of C.M.A.'s paternity action and request for blood tests is reversed and remanded.

**Affirmed in part, reversed in part, and remanded.**