**In re the Matter of Benjamin G. WITSO, Respondent,**

v.

**Mary C. OVERBY, et al., Appellants.**

No. C6–99–1618.

Court of Appeals of Minnesota.

March 9, 2000.

619

Susan A. Daudelin, Walling & Berg, P.A., Minneapolis, for respondent.

John R. Hill, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, for appellants.

Considered and decided by DAVIES, Presiding Judge, LANSING, Judge, and HARTEN, Judge.

## OPINION

DAVIES, Judge

### FACTS

Respondent Benjamin Witso brought this action in April 1999 to establish that he was the father of M.R.O., a child born to appellant Mary Overby in April 1998. Mary Overby is—and was at the time of the conception and birth—married to appellant James Overby. She concedes she had sexual relations with respondent about the time of M.R.O.'s conception.

The Overbys moved to dismiss Witso's paternity petition, asserting that he lacks standing because he does not have the positive genetic-test evidence he needs to make him a presumed father; it is not disputed that, if he were a presumed father, he would have standing. The Overbys have refused to sign a release to allow genetic testing. The district court denied the motion to dismiss and ruled that Witso made a showing that gave him a right to genetic testing, notwithstanding James Overby's presumed paternity as the husband of the mother.

The district court ordered genetic testing and sealed the results; it then certified as important and doubtful this question:

> When the biological mother admits having had intercourse with the putative father during the period of possible conception * * * does the putative father have standing to compel the mother and child to submit to [genetic testing to establish a basis for a paternity presumption]?

To make the certified question reflect the actual issue, we recast it as follows:

> Must a paternity action be dismissed for lack of standing when the petitioning putative father shows the requisite sexual contact but has not had genetic testing, which might establish the genetic basis for standing that arises from a positive genetic test?

We answer this question in the negative and affirm.

### ISSUES

I. Is this certified question properly decided at this time?

II. Must a paternity action be dismissed for lack of standing when the petitioning putative father shows the requisite sexual contact but has not had genetic testing, which might establish the genetic basis for standing that arises from a positive genetic test?

### ANALYSIS

### I.

■ This court should properly answer a certified question that asks whether a motion to dismiss was properly denied. The certified question here falls squarely within the terms of the rule of civil appellate procedure that an appeal may be brought to this court "if the trial court certifies that the question presented is important and doubtful, from an order which denies a motion to dismiss * * * ." Minn. R. Civ.App. P. 103.03(h).

We note also that, were we to decline review, as the dissent urges, the result of the genetic test will be revealed without the opportunity for further appeal. Because rejecting certification would insulate the decision from review and deny the Overby's their day in this appellate court, the interests of justice compel consideration of the certified question at this time. *See* Minn. R. Civ.App. P. 103.04 (Appellate courts "may review any other matter as the interest of justice may require.").

### II.

■ "Whether the trial court properly interpreted the parentage act is a question of law, which we review without deference to the trial court's conclusions." *In re Welfare of C.M.G.*, 516 N.W.2d 555, 558 (Minn.App.1994).

■ The Minnesota Parentage Act provides, in Minn.Stat. § 257.57, subd. 2(1) (1998), that a man alleging himself to be the father of a child may bring an action "for the purpose of declaring the existence of the father and child relationship" based on a *presumed* father status under any of the clauses in Minn.Stat. § 257.55, subd. 1 (1998). Under clause (f) of that subdivision, a man's paternity is presumed if

> [e]vidence of statistical probability of paternity based on blood or genetic testing establishes the likelihood that he is the father of the child * * * is 99 percent or greater.

Minn.Stat. § 257.55, subd. 1(f) (1998). That is the basis respondent asserts for his paternity presumption.

This court, in discussing competing presumptions, has stated that the paternity presumption of the mother's husband does not automatically prevail over a genetic-test-based presumption of paternity. *Kelly v. Cataldo*, 488 N.W.2d 822, 827 (Minn. App.1992), *review denied* (Minn. Sept. 15, 1992). The *Kelly* court stated:

> First, the legislature has withheld a declaration of the weightier presumption, directing instead that the courts adjudicate the issue. Second, and more significantly, the legislature has directed the courts, when weighing considerations of policy and before [determining the] governing conflicting presumptions, to examine the case "on the facts."

*Id.*

■ A positive genetic test thus creates a presumption of paternity that would, in this action to establish paternity, compete with the presumption of paternity applicable to the mother's husband. As this court

held in *Kelly,* the legislature has not declared that one of these provisions is necessarily weightier or that one automatically trumps the other. When competing presumptions are established, the district court in an action to establish paternity must determine which presumption should control by evaluating on the facts which presumption is founded on the weightier considerations of logic and policy. Minn. Stat. § 257.55, subd. 2 (1998). *Kelly* confirmed the judicial obligation in each case to weigh competing marriage and genetic-based presumptions.

The narrow question before us in this case, therefore, is whether a district court must dismiss for lack of standing before the petitioner obtains the genetic testing that may establish the "statistical probability" that gives rise, first, to a genetic-based presumption of his paternity and, second, to the resulting standing to maintain to its conclusion an action to establish the petitioner's paternity.

Although the petitioner in *Kelly* already had a positive genetic test—and the resulting presumption—the *Kelly* court foresaw the question squarely presented in this case:

> [W]e need not determine here the difficult issue which arises when a proceeding such as this is initiated by a man who shows reason to believe testing will demonstrate his presumptive parenthood but who has no present evidence of genetic testing.

*Kelly,* 488 N.W.2d at 828. The *Kelly* court also stated that the question of ordering genetic tests was "invited but not answered by the legislature when it amended the parentage act [in 1989] to establish presumptive parenthood on the basis of genetic testing." *Id.*

1. A man alleging himself to be the biological father would appear to be a "man alleged to be a biological father."

2. The provision continues:
   A mother or alleged father requesting the tests shall file with the court an affidavit

We are not so certain the legislature has left the question unanswered. The statutes quite clearly allow a man in respondent's position to be a *party* to a parentage action:

> The child, the mother, or personal representative of the child, the public authority chargeable by law with the support of the child, the personal representative or a parent of the mother if the mother has died or is a minor, *a man alleged or alleging himself to be the father,* or the personal representative or a parent of the alleged father if the alleged father has died or is a minor *may bring an action:*
>
> (1) at any time for the purpose of declaring the existence of the father and child relationship presumed under section 257.55, subdivision 1, paragraph (d), (e), (f), (g), or (h) * * *.

Minn.Stat. § 257.57, subd. 2 (emphasis added).

In addition:

> The biological mother, each man presumed to be the father under section 257.55, and *each man alleged* to be the biological father, *shall be made parties* * * *.[1]

Minn.Stat. § 257.60 (1998) (emphasis added).

Thus, under the statutes, respondent is a proper party to this action. And, once a party, he enjoys the right to a test provided to each party by the following:

> The court or public authority may, and *upon request of a party shall, require* the child, mother, or alleged father to submit to blood or genetic tests.

Minn.Stat. § 257.62, subd. 1(a) (1998) (emphasis added).[2]

> either alleging or denying paternity and setting forth facts that establish the reasonable possibility that there was, or was not, the requisite sexual contact between the parties.

In summary, a man "alleging himself to be the father" (respondent) is a party under section 257.57, subdivision 2. And, if the man alleging his own paternity (respondent) is an "alleged father"—a reasonable reading—he is also a "party" under section 257.60. Finally, if he is a party, he is entitled to an order for testing under section 257.62, subdivision 1(a).

The dissent views *R.B. v. C.S.*, 536 N.W.2d 634 (Minn.App.1995), as dispositive of the issue in this appeal. Unlike the dissent, we do not read *R.B.* as controlling. In *R.B.*, a putative father was denied a test, but in that case an earlier *adjudication* of paternity overrode all presumptions of paternity—whether based on marriage or genetic testing. *Id.* at 636; *see* Minn. Stat. § 257.55, subd. 2 (1994) (presumption of paternity under this section "is rebutted by a court decree establishing paternity of the child"). Thus, a ruling on the right of putative fathers generally to obtain genetic testing was not necessary to the decision in *R.B.*—nor would a ruling on the question have been appropriate. *See R.B.*, 536 N.W.2d at 635 ("Putative father has no standing *to assert paternity* where another man has been adjudicated the father.") (emphasis added).[3]

*R.B.* is helpful as a guide, however, for in its second ruling (after ruling that the putative father had no right to what was in that case a legally pointless test) the court held that the child could obtain a compelled genetic test. This was because the child was still entitled to challenge the paternity of the adjudicated father and to establish paternity instead in the man alleged to be the genetic father. *Id.* at 638–39 (dismissal of child's "request for [genetic testing] is reversed and remanded"). Thus, the *R.B.* court granted a right to obtain genetic testing to the one party who could make legal use of genetic-test results—the child. Here, respondent is very much in the same *legal* position of the child, that is, still entitled to make legal use of genetic-test results. This *R.B.* ruling is the only judicial guide available as we address the question before us today: whether a party asserting paternity has standing to seek an order for a compulsory genetic test.[4]

■ We rule, based on statutory interpretation and on *R.B.*, that a paternity action should not be dismissed before the putative father has had an opportunity to obtain genetic testing.

We view the issue primarily as one of discovery and procedure, rather than a question of substantive right. *See Garrity v. Kemper Motor Sales*, 280 Minn. 202, 207, 159 N.W.2d 103, 107 (1968) (discovery objective is to allow each party opportunity to obtain all facts relative to its claim or defense). The underlying substantive right respondent asserts was established in *Kelly;* he needs only to discover the fact with which he can prove up a predicate for his claimed paternity.

Our ruling will not allow unreasonable fishing expeditions or casual assertions that a birth was a result of an extramarital relationship. First of all, the presumption of a father-child relationship between a

---

3. The dissent argues that the earlier adjudication that was decisive in *R.B.* was less than a real adjudication. But, though uncontested, the adjudication was a true adjudication, one by stipulation—a type of adjudication we generally welcome.

4. Two other states, which like Minnesota have added a genetic presumption to their parentage acts, have come to conflicting conclusions on whether a putative father has standing to compel a test when there is already a *presumed* father. *Compare B.H. v. K.D.*, 506 N.W.2d 368, 374–75 (N.D.1993) (holding that man, in absence of genetic test, lacks standing to assert paternity when marital presumption of paternity already exists), *with In re S.R.H.*, 981 P.2d 199, 202 (Colo.Ct.App.1998) (holding putative father has standing to assert paternity without first having obtained genetic testing, even when marital presumption of paternity already exists), *cert. granted* (Colo. Aug. 2, 1999). Because these cases point in different directions and were likely decided based on slightly different statutory provisions, they do not provide significant guidance for our decision.

man and a child born to his wife during their marriage can be challenged only

> if the action is brought within two years after the person bringing the action has reason to believe that the presumed father is not the father of the child, but in no event later than three years after the child's birth.

Minn.Stat. § 257.57, subd. 1(b) (1998).

In addition, issues of discovery and procedure are committed to the sound discretion of district courts. And, to obtain testing, a putative father must give a sworn affidavit setting forth facts sufficient to provide a factual basis for believing the genetic-test result may be relevant. Minn. Stat. § 257.62, subd. 1(a) ("alleged father" who requests testing must file affidavit alleging paternity and setting forth facts establishing reasonable probability of "the requisite sexual contact between the parties").

This provision, requiring an affidavit before an alleged father becomes entitled to a genetic test, was added in 1997. 1997 Minn. Laws ch. 203, art. 6, § 21. The legislature did not use "presumed father" to describe who is entitled to a genetic test, but rather used the language "alleged father." The legislature, therefore, created a right for a man to obtain genetic testing though not a presumed father. This discovery and procedural mechanism gives a putative father the right to obtain the information necessary to establish genetic paternity and, thus, to have his paternity action decided on its merits.

■ The parentage act allows for the possibility of conflicting presumptions of paternity. *State v. Thomas,* 584 N.W.2d 421, 423 (Minn.App.1998), *review denied* (Minn. Nov. 17, 1998). To deny putative fathers genetic testing would mean a mother could suppress the truth and frustrate the policy of Minn.Stat. § 257.55, subd. 1(f). *See id.* at 424 ("When you have two men actively wanting to be involved in the life of a minor child, the best interests of the child will be served by a careful balancing of all the policy considerations (too numerous to mention) and the courts will have the luxury of looking at two men who want to be the father.").

Denying Witso and other men similarly situated a lawful procedure to obtain genetic testing also risks disruptive self-help to obtain locks of hair, skin cells, or other genetic specimens. *See Erickson v. Curtis Inv. Co.,* 447 N.W.2d 165, 169 (Minn.1989) (policy of self-help contravenes public policy); *Berg v. Wiley,* 264 N.W.2d 145, 151 (Minn.1978) ("[i]n our modern society, with the availability of prompt and sufficient legal remedies as described, there is no place and no need for self-help"); *see also Glorvigen v. Glorvigen,* 438 N.W.2d 692, 700–01 (Minn.App.1989) (Crippen, J., concurring specially) ("because unjust decisions are not always attacked through formal process, we enlarge the occurrence of self-help efforts to destroy acceptance of judicial decrees").

■ Finally, we note again the limited consequence from allowing respondent to have the genetic testing he requests. If the test shows respondent to be the biological father, there will be conflicting presumptions of paternity. Then the presumption that "is founded on the weightier considerations of policy and logic controls." Minn.Stat. § 257.55, subd. 2. Those considerations require the district court to look at blood relationships, marriage, and the best interests of the child to determine which of the presumed fathers should be adjudicated the legal father. *Thomas,* 584 N.W.2d at 424.

Our decision to give respondent the test he requests does not in any way imply that respondent, if he is the biological father of the child, should prevail over James Overby's marital presumption. We express no opinion on how the district court should resolve that conflict of presumptions, if it in fact arises.

## ·DECISION

We answer the certified question in the negative, concluding that dismissal before

genetic testing would not have been proper. The district court's decision to order genetic testing and not to dismiss the action was proper.

**Affirmed.**

HARTEN, Judge (dissenting)

I dissent on both procedural and substantive grounds. Procedurally, the majority misinterprets Minn. R. Civ.App. P. 103.03(h) and misapplies Minn. R. Civ.App. P. 103.04 in accepting the certified question; substantively, the majority misconstrues Minn.Stat. §§ 257.57, .60, and .62 and ignores controlling precedent in answering that question.

Minn. R. Civ.App. P. 103.03(h) provides that:

> If the trial court certifies that the question presented is important and doubtful [an appeal may be taken] from an order which denies a motion to dismiss for failure to state a claim upon which relief can be granted or from an order which denies a motion for summary judgment.

There is no such order here. The majority contends that this is an appeal "from an order which denies a motion to dismiss," but the motion to dismiss here was brought for lack of standing, not, as the rule requires, "for failure to state a claim upon which relief can be granted." The majority's interpretation impermissibly broadens the rule.

Minn. R. Civ.App. P. 103.04 provides for appellate review of "any other matter as the interests of justice may require." In "the interests of justice," the majority accepts the certified question in order to give "[appellants] their day in this appellate court." But in giving appellants their day in court, the majority compels them to risk destruction of a belief integral to their family structure, i.e., the paternity of James Overby. As the majority notes, the district court will still be free to adjudicate him the legal father, but even an adjudication will be powerless to restore that belief. The majority misapplies Minn. R.

Civ.App. P. 103.04; the interests of justice do not require such a result.

The majority cites various provisions of the parentage act to contend that the legislature has not "left the [certified] question unanswered" because parties to a paternity action are entitled to blood tests and putative fathers are parties to paternity actions. But the majority's construction depends on transposing language included in one provision to another provision.

Minn.Stat. § 257.57, subd. 2, provides that when paternity is presumed under some of the statutory criteria, "a man alleged *or alleging himself to be* the father" may bring an action to establish paternity. (Emphasis added.) Minn.Stat. § 257.60 does not include the emphasized language; it provides that parties to a paternity action shall include "each man alleged to be the biological father." Had the legislature wanted to do so, it could have repeated the "alleged or alleging himself to be" language that the majority's interpretation requires. But "a reviewing court 'cannot supply that which the legislature purposely omits or inadvertently overlooks.'" *Brandt v. Hallwood Management Co.*, 560 N.W.2d 396, 400 (Minn.App.1997) (quotation omitted), *review denied* (Minn. June 11, 1997). Moreover, "[w]here a statute enumerates the persons or things to be affected by its provisions, there is an implied exclusion of others." *Id.* (quotation omitted). The majority's "reasonable reading" thus violates a canon of construction.

Finally, this court has already resolved the certified question. *R.B. v. C.S.*, 536 N.W.2d 634, 637 (Minn.App.1995), holds that "[i]n Minnesota, a putative father must be a presumed father in order to bring a paternity action under the parentage act." In *R.B.*, the child was born out of wedlock; the mother had never married either the presumed or the putative father, and the presumption was based on a signed stipulation of paternity approved by the court and entered as an adjudication. *Id.* at 636.

The majority attempts to distinguish *R.B.* on the ground that there, the paternity of the presumed father had been adjudicated. But here, there was no reason for an adjudication of James Overby's paternity: he and the child's mother are and have been married since before the child's conception, and that marriage is the basis for the presumption of his paternity. *See* Minn.Stat. § 257.55, subd. 1(a) (1998) (marriage to a child's mother establishes presumption of paternity).

Allowing a putative father standing to oppose a married presumed father, as here, but denying a putative father standing to oppose an adjudicated presumed father, as per *R.B.*, introduces an unwarranted and artificial distinction into the parentage law. That distinction means that, until a child of married parents is three, any man who provides an affidavit stating he had sexual relations with the mother around the time of conception will be legally entitled to genetic proof that the child is or is not his, regardless of the mother's or the child's interests. The potential for ensuing familial discord is incalculable.